So Ordered.

Dated: October 1, 2021




Katherine Maloney Perhach
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:
Roberto R. Ledesma,
Debtor.

Chapter 7
Case No. 20-22941-kmp

Christopher G. Meadows,
as guardian ad litem for L.H., a minor,
Plaintiff,

v.

Adv. No. 20-2129

Roberto R. Ledesma,
Defendant.

**DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I, II, AND III**

The Plaintiff in this adversary proceeding is the guardian ad litem for a minor child who is a creditor of the Debtor-Defendant. The Plaintiff filed a personal injury lawsuit in Milwaukee County Circuit Court alleging that the Debtor's dog attacked the child leaving him with permanent facial scarring. The Debtor then filed this Chapter 7 bankruptcy case. The Plaintiff has requested in this adversary proceeding that the Court deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2), (3), (4)(A), and (5). The Plaintiff alleges that: (1) the Debtor transferred or concealed property with the intent to hinder, delay, or defraud a creditor; (2) the Debtor

concealed or failed to keep or preserve recorded information necessary to ascertain the Debtor's financial condition and business transactions; (3) the Debtor knowingly and fraudulently made false oaths or accounts; and (4) the Debtor failed to explain satisfactorily a loss or deficiency of assets to meet his liabilities. The Plaintiff has filed a motion for summary judgment on his § 727(a)(3) and (4)(A) claims, asking the Court to find that there are no genuine issues of material fact related to the Debtor's failure to keep or preserve records about his financial condition and business transactions or related to the knowing and fraudulent false oaths made by the Debtor. For the reasons below, the Court grants the Plaintiff's motion and will enter an order denying the Debtor's discharge under § 727(a)(3) and § 727(a)(4)(A).

**Statement of Jurisdiction**

The Court has jurisdiction over the motion pursuant to 28 U.S.C. § 1334 and the order of reference from the district court pursuant to 28 U.S.C. § 157(a). *See* Order of Reference (E.D. Wis. July 10, 1984) (available at www.wied.uscourts.gov/gen-orders/bankruptcy-matters) (last accessed September 30, 2021). As a proceeding to deny a debtor's discharge, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J) and 28 U.S.C. § 157(b)(1) permits entry of a final judgment.

**Summary Judgment Standard**

"Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (internal citations omitted). Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. To be

"material," a fact must be "outcome-determinative under governing law." *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). For a factual dispute to be "genuine," the evidence must be "such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To assert that a fact is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). If a party fails to address the moving party's assertion of fact, the court may "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

In determining whether there is a genuine issue of material fact, the Court must construe facts and inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). At the summary judgment stage, the role of the court is not to weigh evidence, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party." *Id.* The nonmoving party "may not rest upon the mere allegations or denials of his pleading." *Id.* at 248.

## Legal Standard and Analysis

**I. The Plaintiff Has Proven on Summary Judgment that Denial of the Debtor's Discharge is Warranted.**

"The primary benefit of filing for bankruptcy under Chapter 7 is that the financial discharge gives the debtor a 'fresh start.'" *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). The benefit is not unlimited, but is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). Here, the Plaintiff has the burden of proving his § 727(a)(3) and (4)(A) claims by a preponderance of the evidence. *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966-67 (7th Cir. 1999). The Plaintiff has established all of the elements of both claims through his summary judgment motion. The Debtor has filed no affidavits or exhibits in opposition to the motion, as contemplated by Rule 56(c)(1). Instead, the Debtor has attempted to rely on unsupported representations by counsel in the form of a short brief. As the Plaintiff points out, representations in a brief do not constitute evidence. *Walker v. Bd. of Regents*, 300 F. Supp. 2d 836, 857 (W.D. Wis. 2004). They cannot defeat summary judgment.

**II. The Debtor's Discharge Is Denied Under § 727(a)(3) Based on His Failure to Maintain Records from Which His Financial Condition and Business Transactions Might Be Ascertained.**

Section 727(a)(3) provides that the court shall not grant a debtor a Chapter 7 discharge if

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

The statute requires debtors to document their financial transactions, not simply refrain from destroying records. "''Keep' and 'preserve' are not synonyms. 'Keep' has the same meaning it would have in phrases such as 'to keep a diary' or 'to keep a record,' that is, to maintain a record

by entering it in a book. Otherwise, the repetition of the word 'preserve' is superfluous, a disfavored result." *Scott*, 172 F.3d at 969. "Neither the court nor a creditor is required to reconstruct a debtor's financial situation by sifting through a morass of checks and bank statements." *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 899 (7th Cir. 2002). Moreover, debtors are "not entitled to substitute oral testimony for the written documentation that was missing from" their written records. *In re Juzwiak*, 89 F.3d 424, 430 (7th Cir. 1996). "Creditors do not need to prove that the debtor intended to defraud them in order to demonstrate a § 727(a)(3) violation." *Id.*

The Plaintiff has shown that the Debtor failed to keep records from which his financial condition might be ascertained, and the Debtor has not offered any compelling argument or evidence that this failure was justified. Most problematically, the Debtor failed to provide any record accounting for at least $34,570.57 that he received from January 1, 2018 to August 3, 2020 through services like Cash App and Venmo.[1] He also failed to document his gambling activities and ordinary expenses.

A. The Debtor Failed to Maintain Sufficient Records of His Financial Transactions Through Venmo and Cash App.

The Debtor's Venmo and Cash App transaction histories provided in discovery are not sufficient records of these transactions from which the Debtor's financial condition might be ascertained because they fail to show the reasons for deposits or expenditures.[2] Unlike traditional bank statements that indicate the source of a deposit and the recipient of a payment, as well as including canceled checks, the documents provided are almost incomprehensible. For example, one entry apparently for a $220 payment to the Debtor reads,

[1] The Plaintiff asserts this as a proposed undisputed fact and the Debtor has not challenged the figure. The Court has not independently calculated any sum based on the Venmo and Cash App transaction histories.
[2] Bradley Dec. ¶¶ 19-21, Ex. 12-14.

> 7826, 2019-09-20T22:06:59, Payment, Complete, ðŸ§€ðŸ§€, Jordan Forrest, Robert Ledesma, + $220.00, , , [3]

Other representative entries read:

> 6125, 2018-10-30T21:22:55, Payment, Complete, 5/10 sex, Jenna Nakatsuji, Robert Ledesma, +$80.00, , ,
>
> 5620, 2018-10-20T02:46:29, Payment, Complete, Becca being smelly, Paul Boyle, Robert Ledesma,+ $100.00, , ,
>
> 5194, 2018-11-16T01:35:25, Payment, Complete, Ball sack, Ariana Mulle, Robert Ledesma, +40.00, , , [4]

Other than the fact that another person was apparently initiating a payment to the Debtor on a certain date at a certain time, it is impossible to tell anything else from these entries. The Debtor's only response to the cash app records is that

> the plaintiff has submitted to the court pages upon pages of cash app and venmo records, along with . [sic] These applications serve as a social media platform for individuals of the debtor's age, and while there are sometimes personal messages that an individual would not want publicized on a federal court's docket, the debtor complied with the plaintiff's discovery demand to produce these records without censure, which would have provoked further questions of whether we were obscuring.

Debtor's Response Brief, p. 5. The problem is not that some of the personal messages accompanying the payments to the Debtor are vulgar. The problem is that the "records" do not describe what the payments are actually for, nor was the Debtor able to provide an explanation at his Rule 2004 examination:

> Q. Okay. So you don't dispute that you have a large amount of transactions that you can't account for; correct?
> A. Yeah.[5]

---

[3] Bradley Dec. ¶ 20, Ex. 13 at 2.
[4] Bradley Dec. ¶ 19, Ex. 12; *see also* Bradley Dec. ¶ 20-21, Ex. 13-14.
[5] Bradley Dec. ¶ 6, Ex. 1 at 75:20-23.

Neither the court nor the creditor is required to reconstruct a debtor's financial situation by sifting through a morass of Venmo and Cash App receipts that show the transfer of funds in the amount of $34,500 to ascertain the Debtor's true financial situation. This is not an insignificant amount of money when the Debtor's federal tax returns show that he makes approximately $21,000 a year working as a server at Elsa's on the Park.

The Debtor has offered no evidence to refute his failure to keep records related to these cash app transactions. The Debtor has not cited "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," as Rule 56(c) requires of a party asserting a fact is genuinely disputed. It is uncontested that the Debtor has failed to keep records of $34,500 in cash app deposits, warranting denial of his discharge for failure to maintain records from which his financial condition may be ascertained.

B. The Debtor Failed to Maintain Records of Gambling Activity.

The Debtor has also failed to keep any records related to his gambling activities. He failed to disclose any gambling losses on the original Statement of Financial Affairs he filed with the Court.[6] He also failed to produce a single document in response to the Plaintiff's request for production of a complete accounting of any and all gambling earnings and losses.[7] Instead, he commented that "[n]o written records exist regarding gambling. The activity was informal and unrecorded and not subject to reconstruction in any accurate manner or with exact dates or transaction amounts."[8]

---

[6] Bradley Dec. ¶ 7, Ex. 2.
[7] Bradley Dec. ¶ 26, Ex. 18, p. 2 at ¶ 9.
[8] *Id.*

The Court acknowledges the difficulty consumer debtors face with explaining and documenting gambling winnings and losses, especially the small gains and small losses of a gambling addiction that would not otherwise trigger issuance of a Form 1099 like a large gain would. In an ordinary case, this might counsel against the Court finding that a debtor has failed to produce records related to gambling. But this is not an ordinary case. In this case, the Debtor testified under oath at his Rule 2004 examination on August 7, 2020, "I used to gamble a lot, yeah, but I haven't in the past year."[9] Three weeks later, the Debtor filed an Amended Statement of Financial Affairs in which he swore under penalty of perjury that he had a $5,000 gambling loss over the twelve months prior to filing.[10] The Debtor went from "not gambling" in the last year to having a $5,000 gambling loss in the last year. There should be records to document a $5,000 gambling loss, especially where the Debtor previously testified that he had not gambled in the last year.

The Debtor has presented no evidence to refute a conclusion that he failed to keep records related to his gambling activities which has prevented his creditors from ascertaining his true financial condition. The Debtor has not cited "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," as Rule 56(c) requires of a party asserting a fact is genuinely disputed. This further supports the Court's denial of the Debtor's discharge under 11 U.S.C. § 727(a)(3).

---

[9] Bradley Dec. ¶ 6, Ex. 1 at 72.
[10] *In re Ledesma*, No. 20-22941-kmp, Docket No. 46 at 6 (Question 15).

C. The Debtor Maintained Sufficient Records of His Cable Installation Income.

The Court rejects the Plaintiff's argument that the Debtor failed to keep records related to $1,004 that he earned when he was self-employed as an independent contractor cable technician. The Debtor testified at the Rule 2004 examination that he was self-employed as an independent contractor cable technician for Spectrum.[11] The Debtor also provided copies of checks that he received for his work along with records showing the jobs he completed related to the checks.[12] Even though the Debtor produced absolutely no evidence in opposition to summary judgment, the Plaintiff concedes that this income has been "somewhat substantiated." Plaintiff's Brief at p. 9. Thus, the Debtor has sufficiently accounted for this income such that it does not show a failure to maintain records from which his financial condition might be ascertained.

D. The Debtor Failed to Keep Records Related to His Car Repair Business.

The Debtor has also failed to keep records related to his car repair business. The Debtor claims in his brief in opposition to the Plaintiff's motion for summary judgment that the Debtor did not have a car repair business and that he merely had a friend repairing a car in his garage. The Debtor offers no evidence to support these statements made in his brief. Moreover, the Debtor failed to timely respond to the Plaintiff's requests for admission, one of which asked him to admit that he was "paid for repairing and/or 'working on' vehicles or other automobiles, which did not belong to you, on the premises of 1934 S. Layton Blvd., Milwaukee, WI 53215 at various times while residing at the above-stated address . . .".[13]

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, incorporated in adversary proceedings by Rule 7036 of the Federal Rules of Bankruptcy Procedure, and due to the Debtor's

[11] Bradley Dec. ¶ 6, Ex. 1 at 42.
[12] Bradley Dec. ¶ 26, Ex. 18, pp. 25-42.
[13] Bradley Dec. ¶¶ 4, 10-11, Ex. 4.

failure to timely respond to the Plaintiff's requests for admission, it is deemed admitted that the Debtor was paid for repairing or working on vehicles that did not belong to him. The Debtor has raised no genuine issue of material fact related to his failure to maintain records related to the car repair business. The failure to maintain these records related to this income and from which his creditors could ascertain his business transactions supports a denial of the Debtor's discharge under § 727(a)(3).

E. The Debtor Failed to Keep Records Related to Additional Income Noted on his Tax Return.

The Debtor has also failed to keep records related to the "qualified business income" reported on his federal tax return in 2019 in the amount of $933.00. The Debtor has offered no evidence to support the statement made in his response brief that the "qualified business income deduction is the debtor's accountant's treatment of the income from installing fiber optic cable which was not treated as an employee relationship and was treated as a contractor relationship." Response Brief, pp. 5-6. Furthermore, the statement made in the Debtor's brief by his counsel assigning responsibility to the Debtor's accountant for the treatment of this income in the Debtor's 2019 tax return is entirely contradicted by the Debtor's testimony under oath at his 2004 examination during which he testified that he prepared his own tax returns in 2019.[14] The copy of the 2019 return provided also states it was self-prepared.[15] Presumably, if the Debtor prepared his own tax returns in 2019, he should know the basis for this income and he should produce the records that he relied upon in preparing the tax returns. There is no genuine issue of material fact. The Debtor has failed to maintain the records related to the "qualified business income" which would assist the Plaintiff in ascertaining his income and his financial condition.

[14] Bradley Dec. ¶ 6, Ex. 1 at 35-36.
[15] Bradley Dec. ¶ 16, Ex. 9.

The failure to maintain these records also weighs in favor of denial of the Debtor's discharge pursuant to § 727(a)(3).

F. The Debtor Failed to Maintain Records of Ordinary Expenses.

Finally, the Plaintiff argues that the Debtor failed to maintain and provide records confirming or reflecting his monthly expenses from January 1, 2020 to the present (e.g., internet, cell phone, electricity, water, rent, subscriptions, memberships, etc.). The Debtor provided a single undated screenshot of a Spectrum account belonging to "Roberto REDESMA" with a $0.00 balance and a single screenshot of a WE Energies account for the entire upper unit of 1934A Layton Street, which he shares with at least two other occupants, and which shows a past due account and an amount due of $529.77.[16]

The Debtor has not come forward with any evidence to refute his failure to keep records related to his expenses. The Debtor has not provided any annotated bank statements or copies of checks or any other payment information to support his expenses. The Debtor has not provided copies of bills other than the two screenshots for Spectrum and WE Energies. Neither the Court nor the creditor is required to reconstruct the Debtor's expenses by sifting through bank statements, to the extent available or even provided by the Debtor, to ascertain the Debtor's true financial situation. The Debtor has not shown that his bank statements contain this information, nor has he offered any evidence that he has documented his expenses in any other manner. *See* Rule 56(c). Under ordinary circumstances, perhaps the Debtor's failure to provide documents related to his ordinary expenses would not support a denial of the Debtor's discharge under § 727(a)(3) for failure to keep records. However, given this Debtor's comprehensive failure to keep records in so many different ways, his failure to show that he kept any record of his normal

[16] Bradley Dec. ¶ 26, Ex. 18 at 43-45.

expenses contributes to the finding that he has failed to keep records from which his financial condition might be ascertained, justifying a denial of his discharge under § 727(a)(3).

G. The Debtor's Lack of Sophistication Offers No Defense.

The Debtor tries to explain away his myriad failures to keep records from which his financial condition or business transactions could be ascertained by asserting that he is just an unsophisticated "young man with a high school education" who "lives in a house owned by his father" and who "doesn't have any significant assets in his own name." The Court acknowledges that there are different standards of recordkeeping for ordinary consumer debtors versus debtors engaged in complex business enterprises. *Layng v. Pansier (In re Pansier)*, 613 B.R. 119, 152 (Bankr. E.D. Wis. 2020) ("The type and quantity of records required to satisfy the debtor's duty under section 727(a)(3) varies, based on the circumstances of the case."); *see also Juzwiak*, 89 F.3d at 426-28. This Court does not expect an ordinary consumer debtor to maintain pristine records of all aspects of income and expenses. But an ordinary consumer debtor is required to keep and produce at least some of those records. Making some effort to produce copies of bank statements, tax returns, check images, bills, invoices, leases, pay stubs, or explanations of cash app transactions goes a long way toward allowing a creditor to ascertain a debtor's financial condition. The Debtor has offered no evidence to support a conclusion that his failure to keep records related to his income and expenses was justified. The Debtor's failure to keep any intelligible records related to his Venmo and Cash App transactions, including receipt of a total of $34,570.57, or any records at all related to his gambling history, car repair business, the additional income noted on his tax return, and his ordinary expenses requires denial of his discharge pursuant to § 727(a)(3).

## III. The Debtor's Discharge is Denied Under § 727(a)(4) Based on His Knowing and Fraudulent False Oaths and Omissions.

Section 727(a)(4)(A) requires denial of a debtor's discharge if the debtor "knowingly and fraudulently, in or in connection with the case made a false oath or account." To establish a claim under this section, the Plaintiff "must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat*, 635 F.3d at 978.

"Omissions from bankruptcy schedules and statement of financial affairs constitute a false oath for purposes of section 727(a)(4)(A)." *Pansier*, 613 B.R. at 160. Additionally, "[f]alse testimony given during a section 341 creditors meeting or a Rule 2004 examination also constitutes a false statement." *Id.*

A showing of reckless disregard for the truth is sufficient to prove fraudulent intent under § 727(a)(4). *Stamat*, 635 F.3d at 982. The Seventh Circuit has said that a debtor's "many false statements [may] bespeak a pattern of reckless indifference to the truth, implying fraudulent intent." *Skavysh v. Katsman (In re Katsman)*, 771 F.3d 1048, 1050 (7th Cir. 2014).

The bar for finding that a statement or omission is "material" is low. *See Lardas v. Grcic*, 847 F.3d 561, 570 (7th Cir. 2017) ("[M]ateriality in the bankruptcy context has a broad meaning."). The "successful functioning of the Bankruptcy Code hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Stamat*, 635 F.3d at 983 (citation omitted). Consequently, "[d]ebtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate." *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992). Courts judge whether a fact is material on the basis of whether it "bears a relationship to the debtor's business

transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Stamat*, 635 F.3d at 982 (citation omitted). The "issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors." *Id.* (citation omitted).

A. <u>The Debtor Made Knowing and Fraudulent False Oaths and Omissions Related to His Income</u>.

The Plaintiff has shown that the Debtor made a number of false statements under oath that he knew were false. First, the Debtor failed to disclose deposits totaling $34,570.57 from Venmo and Cash App from January 1, 2018 through August 3, 2020 on his Statement of Financial Affairs. The chart below shows the gross income from wages, commissions, bonuses, and/or tips disclosed on the Debtor's Statement of Financial Affairs, the income shown on his W-2 forms, and the income shown on his federal tax returns.

| **Time Period** | **SOFA** | **W-2** | **Federal Tax Return** |
|---|---|---|---|
| January 1, 2020 to April 20, 2020 | 6,646.00 | n/a | n/a |
| 2019 calendar year | 24,750.00 | 20,916.51[17] | 21,921.00[18] |
| 2018 calendar year | 18,161.00 | 21,545.56[19] | 21,546.00[20] |
| Total | 49,557.00 | 42,462.07 | 43,467.00 |

The income disclosed by the Debtor on his Statement of Financial Affairs, which he declared under penalty of perjury was true and correct, clearly does not include $34,570.57 in cash app deposits.[21] The difference between the 2018 and 2019 income shown on the Statement of Financial Affairs and the 2018 and 2019 W-2 income is $7,094.93, significantly less than the $34,570.57 in cash app deposits. Even if all of the 2020 income shown on the Statement of

[17] Bradley Dec. ¶ 26, Ex. 18.
[18] Bradley Dec. ¶ 16, Ex. 9.
[19] Bradley Dec. ¶ 26, Ex. 18.
[20] Bradley Dec. ¶ 14, Ex. 7.
[21] Bradley Dec. ¶ 7, Ex. 2 (Question Nos. 4 and 5).

Financial Affairs was from cash app deposits, the Statement of Financial Affairs does not come close to accounting for $34,570.57. The Debtor has provided no evidence to refute a conclusion that the Debtor made a false oath by failing to disclose these cash app transactions which appear to be income for the Debtor. This serious omission, without any explanation, weighs most heavily in favor of denial of the Debtor's discharge under § 727(a)(4).

Second, the Debtor failed to disclose the $1,128 he received from selling basketball tickets on his Statement of Financial Affairs.[22] The only "other income" disclosed by the Debtor in response to Question 5 on the Statement of Financial Affairs was $380 in "unemployment" received in 2020.[23] The Debtor has provided no evidence to refute a conclusion that the Debtor made a false oath by failing to disclose the income received from selling basketball tickets.[24]

The Debtor's omission of income from his Statement of Financial Affairs demonstrates a "reckless indifference for the truth." Although the Debtor made some amendments to his bankruptcy schedules and the Statement of Financial Affairs on August 26, 2020, after sitting for his Rule 2004 examination on August 7, 2020, he did not amend the part of the form addressing income. The Amended Statement of Financial Affairs does not account for the $34,500 in cash app deposits or the $1,128 he received from selling tickets in 2020.[25] The Debtor has not

---

[22] Bradley Dec. ¶ 6, Ex. 1 at 81:19-25, 82:1-12.
[23] Bradley Dec. ¶ 7, Ex. 2 (Question Nos. 4 and 5).
[24] The Plaintiff would also like the Court to find that the Debtor omitted income he received from installing cable from his Statement of Financial Affairs. This finding is not supported by the evidence before the Court. The Debtor testified at his Rule 2004 examination that he was an independent contractor and did report the income on his taxes. Bradley Dec. ¶ 6, Ex. 1 at 38:6-42:19. As shown on the chart above, the Debtor reported income in 2019 in the amount of $24,750 on his Statement of Financial Affairs, which is more than what his W-2 from his work as a waiter at Elsa's disclosed, and more than what he disclosed on his tax returns. At a bare minimum, there is a genuine issue of material fact related to this issue such that the Court declines to find that the Plaintiff has proven as a matter of law that the Debtor made a false oath on his Statement of Financial Affairs related to his income from his cable job.
[25] *In re Ledesma*, No. 20-22941-kmp, Docket No. 46.

explained or offered any evidence as to why these items do not need to be listed as a source of "other income"

Even following his Rule 2004 examination, the Debtor has failed to explain the $34,500 in cash app deposits. In his brief, counsel states, that the

> income disparity that appears on the debtor's cash app and venmo comes from paying for his roommate's rent - because the debtor pays his father and the roommates and renters pay the debtor for the debt incurred to his father. It neither benefits him nor has a pecuniary effect for him - as the transaction is with the owner of the property and not with the debtor. The debtor did not see the transaction as being income.

Response Brief, p. 5. However, as noted by the Plaintiff, the transaction histories show that the Debtor received payment from a number of people that he did not identify as having been his roommates. Moreover, only $4,400 of the income could have potentially come from reimbursement for rent, based on the Debtor's testimony of the times during which he had roommates and the rent charged.[26] The statements in the Debtor's brief also are inconsistent with his testimony at the Rule 2004 examination:

> Q. Okay. So here, for instance, you have $298.46 coming from, from a McKenzie Beyler. You have $438.32 coming in from a Jacob Gevers, and then an additional $49.25, a deposit, a deposit of $100, then another $250. Do you know what these amounts are for?
> A. I do not, no.
> Q. Do you know who McKenzie Beyler is?
> A. Yes.
> Q. Who is she?
> A. A friend.
> Q. A friend.
> Is there any reason why she would be sending you $298.46?
> A. I don't remember.
> Q. You don't remember.

[26] *See* Second Bradley Dec. ¶¶ 11-21.

> Because I went through the bank statements, and she's actually, she's actually sent you quite a lot more than just that. She has sent a total of $1,374.08 just in 2018.[27]

Overall, the Debtor appeared to have no recollection of what the cash app deposits were for:

> Q. So, Mr. Ledesma, you have all of these transactions that you don't remember where they're coming from that in 2019 totaled to over $13,000.
> A. Yeah, I don't remember.
> Q. And right, I understand that you say that. And so I'm just wondering, you know, have you reported, have you reported this income? I mean, no?
> A. Not, no.
> . . . .
> Q. Okay. So you don't dispute that you have a large amount of transactions that you can't account for; correct?
> A. Yeah.
> Q. And you have not reported those on your bankruptcy schedule?
> A. Yeah.[28]

It is entirely implausible the Debtor could not remember the source of any significant portion of the cash app deposits or provide examples of likely reasons for the deposits. In 2019, for example, the income shown on his federal tax return was $21,921. An additional $13,000 is a significant amount of money compared to that income. The Debtor has presented no evidence to refute a conclusion that he acted with a "reckless indifference for the truth" thereby acting with fraudulent intent in making false statements and omitting information from his Statement of Financial Affairs.

The Debtor's omission of this income from his Statement of Financial Affairs is also "material." A failure to disclose $34,500 in cash app deposits, along with the income received from selling basketball tickets, clearly concerns the "discovery of assets" and "the existence and

[27] Bradley Dec. ¶ 6, Ex. 1 at 68-69.
[28] Bradley Dec. ¶ 6, Ex. 1 at 75-76.

disposition of the debtor's property." The Debtor has offered no evidence to rebut a conclusion that his omission from his Statement of Financial Affairs was material.

There are no genuine issues of material fact. The Debtor has knowingly and fraudulently made a false oath by failing to disclose $34,500 in cash app deposits and $1,128 in basketball ticket sales as income on his Statement of Financial Affairs, warranting denial of his discharge under § 727(a)(4)(A).

B. The Debtor Made Knowing and Fraudulent Oaths and Omissions About His Gambling Losses.

The Debtor also made false oaths related to his gambling losses. He initially failed to disclose whether he had income or losses from gambling on his Statement of Financial Affairs.[29] He changed his story at his Rule 2004 Examination on August 7, 2020 when he testified under oath, "I used to gamble a lot, yeah, but I haven't in the past year."[30] Three weeks later, the Debtor amended his Statement of Financial Affairs under penalty of perjury to show a loss of $5,000 for "cash and gambling (over the last 12 months prior to filing)."[31] The Debtor went from "not gambling" to having a $5,000 gambling loss. The only conclusion that can be drawn from his inconsistent testimony and declarations under oath is that the Debtor made a false oath either in his Rule 2004 Examination or in his Amended Statement of Financial Affairs about whether he had gambling losses in the last year. The Debtor's brief in opposition to summary judgment does not address gambling at all. The Debtor has offered no evidence to refute a conclusion that he made a false oath related to his gambling losses.

It is entirely unclear what the Debtor claims the truth is regarding the Debtor's gambling after he filed his original Statement of Financial Affairs, had the opportunity to produce

[29] Bradley Dec. ¶ 7, Ex. 2 at 44.
[30] Bradley Dec. ¶ 6, Ex. 1 at 72.
[31] *In re Ledesma*, No. 20-22941-kmp, Docket No. 46 at 6 (Question 15).

documents in discovery, sat for a Rule 2004 examination, amended his Statement of Financial Affairs, and had the opportunity to point out a claimed genuine fact issue in responding to the summary judgment motion. This complete lack of transparency and switching of stories contributes to and strengthens the conclusion that the Debtor acted with fraudulent intent in showing at least reckless disregard for the truth related to his gambling and the Debtor has presented no evidence to rebut this conclusion. The Debtor's various false statements about his gambling also related materially to this bankruptcy case by preventing the creditor from discovering assets or determining the existence or disposition of the debtor's property.

There are no genuine issues of material fact. The Debtor knowingly and fraudulently made a false oath related to this gambling loss on his Statement of Financial Affairs, his Amended Statement of Financial Affairs, or in his Rule 2004 examination testimony, warranting denial of his discharge under § 727(a)(4)(A).

C. The Debtor Made Additional Knowing and Fraudulent False Oaths and Omissions on His Schedules and Statement of Financial Affairs.

The Debtor's bankruptcy schedules and Statement of Financial Affairs also contained the following errors and omissions. The Debtor:

1. Represented on Schedule A/B that the current value of his BMO checking account was $100 as of April 17, 2020, when it was in excess of $1,200, testifying that he "obviously didn't look" at his account and admitted that he just guessed, even though he knew that he was signing the statements and schedules under the penalty of perjury;[32]

[32] Bradley Dec., ¶ 6, Ex. 1 at 61:5-20.

Q. And so you have no reason to dispute that you in fact received a $1,200 deposit on April 15th and only, and a $25.03 deposit on the 16th, and then only and the only deductions were the $5 one on the 16th and the $7.42 on the 17th. So you have no reason to dispute those charges; correct?
A. I don't check my bank account every day.
Q. Right. But, Mr. Ledesma, you swore under the penalty of perjury that you only had a hundred dollars on your BMO, in your BMO account.
A. That's what I thought. I obviously didn't look so --
Q. So you swore to something that you. you just guessed?
A. Yeah.

2. Failed to list any household goods on Schedule A/B, despite having taken out a loan for $1,500 to purchase a mattress and bed set prior to filing the bankruptcy case;[33]

3. Listed a monthly expense of $195.00 for car insurance on Schedule J, when he did not have car insurance;[34]

4. Failed to disclose the purchase of an $895.70 camera as a gift for his girlfriend;[35] and

5. Failed to disclose the transfer of a 2004 Honda Accord.[36]

The Debtor has provided no evidence to refute a conclusion that the Debtor made a false oath by failing to disclose or inaccurately disclosing this information on his schedules and Statement of Financial Affairs.

These additional omissions, along with the omission of the $34,500 in cash app deposits and the omission and/or false statements related to the Debtor's gambling losses, show a pattern of omission by this Debtor. The sheer number of omissions, coupled with the fact that the Debtor has still failed to offer an explanation of the $34,500 in cash app deposits and has offered entirely inconsistent descriptions of his gambling, while under oath, constitute a pattern of omission and strengthens the conclusion that the Debtor acted with an intent to defraud. Though some of these omissions might appear minor on their own, when taken together, they contribute to the conclusion that the Debtor acted with a reckless disregard for the truth, at the very least. And again, the Debtor did not produce any evidence in response to the summary judgment motion to negate the inference of fraudulent intent.

Following the Rule 2004 examination, the Debtor made amendments that address these omissions. Although "[a] small number of initial omissions may not warrant denial of discharge, where there is no evidence of intent to defraud, or no pattern of omission," "[a]llowing a debtor

[33] Bradley Dec. ¶ 6, Ex. 1 at 82:20-83:20, 84:14-24.
[34] Bradley Dec. ¶ 6, Ex. 1 at 96:15-97:22
[35] Bradley Dec. ¶ 6, Ex. 1 at 95:20-96:10.
[36] Bradley Dec. ¶ 9, Ex. 3 at 6:21-7:12.

to submit false schedules and then, on discovery, avoid the negative consequence of his dishonesty by amending those schedules is contrary to the spirit of the law which aims to relieve honest debtors only." *Layng v. Sgambati (In re Sgambati)*, 584 B.R. 865, 872 (Bankr. E.D. Wis. 2018) (internal citation omitted). Given the evidence of intent to defraud, and the pattern of omissions by this Debtor, the amendments made by the Debtor after he was caught submitting false schedules and a Statement of Financial Affairs does not save the Debtor from a finding that he knowingly and fraudulently made false oaths.

There is also no ignoring the fact that the omissions described above fall within the scope of "material" omissions. Failure to disclose ownership of a bed set and the accurate balance of a bank account involve the "existence of the Debtor's property." Failure to disclose the transfer of a vehicle or the purchase of an expensive camera as a gift involves the "disposition of the debtor's property."

There are no genuine issues of material fact. The Debtor has not even attempted to explain the errors and omissions in such a way that would negate an inference of an intent to defraud. The Debtor knowingly and fraudulently made false oaths related to the above-referenced errors and omissions in his bankruptcy schedules and Statement of Financial Affairs, and his pattern of errors and omissions warrants denial of his discharge under § 727(a)(4)(A).

D. The Debtor's Argument That He Received Inadequate Legal Advice Does Not Alter the Court's Conclusion That He Acted with Fraudulent Intent.

The Debtor attempts to justify the false oaths and omissions he made in this case by blaming his bankruptcy attorney. The Debtor retained a different attorney to represent him in this adversary proceeding. This new attorney represented in the Debtor's response brief that:

> [t]he debtors [sic] avers that he did not have the chance to speak to his attorney in person while finishing the preparation for his petition, and that the explanation over the phone was quick and

> constrained, because the attorney was not working in the office at the time. The debtor received all the bankruptcy forms through email and signed them, and while he received the advisements of the consequences of filing thoroughly completed forms - there was a feeling that amendments could take account of his situation in a more complete way - when things returned to normal, which felt to be just two weeks away. Then two weeks later, and two weeks more. The unique situation the debtor found himself in, at the hinge point of the pandemic, affected the preparation of his schedules and the preparation for his examination. The strange aspect of the filing, it doesn't appear to have been necessary to have rushed the filing of the petition, the same conditions that made it difficult to prepare the petitions also would have delayed collection actions or any movement in a civil proceeding.

Response Brief, pp. 2-3. The Debtor has submitted no affidavit or evidence to support any of these statements. This argument seems like it is intended to imply that Debtor's bankruptcy counsel failed to provide him with adequate legal advice, and that the Court should therefore excuse his false oaths and omissions. However, this type of possible insinuation in a brief is insufficient to negate the Court's inference that the Debtor acted with fraudulent intent. The Seventh Circuit has said that a debtor's failure to "seek advice of counsel, while knowing that she lacked legal training or knowledge, bespoke a reckless indifference to truth, and no more is required for fraudulent intent in bankruptcy." *Katsman*, 771 F.3d at 1050. If the Debtor failed to seek advice from his attorney during the preparation of his bankruptcy petition and schedules, that failure is imputed to him. If he believes he received flawed advice and asserts that this ought to negate an inference of fraudulent intent, he ought to have submitted some material the Court can consider in response to the motion for summary judgment, such as an affidavit or declaration. *See* Fed. R. Civ. P. 56(c)(1).

The Court finds that the Plaintiff has proven fraudulent intent by a preponderance of the evidence. The Debtor has not even attempted to explain the errors and omissions in such a way that would negate any inference of an intent to defraud. The omissions of income from his

Statement of Financial Affairs, including $34,500 cash app deposits, and his failure to amend the Statement of Financial Affairs to account for this income despite making other amendments in itself shows a reckless disregard for the truth. The initial exclusion of any gambling income or losses strengthens the conclusion that the Debtor acted with the requisite intent, as do the sheer number of other omissions. Though some of the other omissions might appear minor on their own, when taken together, they contribute to the conclusion that the Debtor acted with reckless disregard for the truth, at the very least.

E. The Plaintiff Failed to Establish Whether the Debtor Knowingly and Fraudulently Omitted Rent Payments Made to His Father.

The Plaintiff asserts that the Debtor omitted information from his Statement of Financial Affairs related to the rent payments he made to his father. The Plaintiff alleges the Debtor made the following undisclosed payments to his father, all by Venmo:

| Date | Amount |
|---|---|
| February 4, 2020[37] | $500.00 |
| | $300.00 |
| February 29, 2020[38] | $201.00 |
| | $200.00 |
| March 3, 2020[39] | $400.00 |
| April 2, 2020[40] | $800.00 |

The Debtor testified at his Rule 2004 examination that he pays his father rent, his share of a phone bill, the water bill, and part of his student loan.[41] The Plaintiff believes that this information should have been disclosed by the Debtor on his Statement of Financial Affairs in response to Question No. 7 ("Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?") and Question No. 8 ("Within 1 year

[37] Bradley Dec. ¶ 20, Ex. 13 at 6.
[38] Bradley Dec. ¶ 20, Ex. 13 at 6.
[39] Bradley Dec. ¶ 20, Ex. 13 at 8.
[40] Bradley Dec. ¶ 20, Ex. 13 at 8.
[41] Bradley Dec. ¶ 6, Ex. 1 at 72:14-25.

before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?"). Although the Debtor's Venmo transaction history does show payments to his father, there is no evidence in the record that shows that the Debtor owed a debt to his father or that the Debtor knew such rent payments would constitute "payment on a debt owed to an insider" or "payments on account of a debt that benefited an insider" or "a transfer of property on account of a debt that benefited an insider." This precludes reliance on the Debtor's alleged failure to disclose payments to his father in entering summary judgment in favor of the Plaintiff on this issue.

F. The Plaintiff Failed to Establish That the Debtor Knowingly or Fraudulently Failed to Properly Schedule the Bed Set Creditor.

The Plaintiff also asserts that the Debtor omitted information from his Statement of Financial Affairs when he failed to list creditors from whom he borrowed money to purchase a bed set. The Plaintiff believes that this information should have been disclosed by the debtor on the Statement of Financial Affairs in response to Question No. 6 ("During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?"). Based on the Debtor's testimony at the Rule 2004 examination, there remain fact issues as to whether the Debtor still owed money on the bed at the time of his bankruptcy filing and whether the Debtor paid the creditor more than $600.

Based upon the Debtor's testimony at his Rule 2004 examination, there is a fact issue as to whether the Debtor still owed a creditor money based on the purchase of the bed set:

> Q. And do you still have an outstanding loan --
> A. No.
> Q. -- with -- No. So you paid that off?
> A. Yes.[42]

[42] Bradley Dec. ¶ 6, Ex. 1 at 85:1-5.

Based upon the Debtor's testimony at his Rule 2004 examination, there is an additional fact issue as to whether the Debtor paid the purported creditor more than $600. The Plaintiff's questioning at the Rule 2004 examination and the Plaintiff's proposed undisputed facts refer to both "Tab Snap Loan" and "Snap Second Look, LLC." Nothing establishes that these are the same entity. The Debtor paid Tab Snap Loan $287.58 in the 90 days before filing the bankruptcy petition, $143.79 on January 31, 2020 and the same amount on February 14, 2020.[43] If this was the creditor, the payments total less than $600 and would not need to be disclosed.

The Debtor also paid Snap Second Look LLC $1,000 on February 3, 2020 and $509.73 on February 24, 2020.[44] Snap Second Look LLC is categorized as "Clothing/Shoes" on the Debtor's banking records. Counsel for the Plaintiff and the Debtor had the following exchange at the Rule 2004 examination:

> Q. . . . So you have a, you paid a thousand dollars to Snap Second Look LLC. It's listed as clothing and shoes, but it's not clothing and shoes.
> A. I have no idea.
> Q. Okay. Well, I did Google it, and it's a loan company. So can you tell me why you paid a loan company a thousand dollars?
> A. It has to be the -- I have no idea, honestly.
> Q. Okay. This was this year, this was February 3rd of this year before you filed for bankruptcy that you paid a thousand dollars to --
> A: I don't remember.
> Q. You don't remember why --
> A. I don't remember.[45]

Based on this exchange, there is a fact issue as to whether either Tab Snap Loan or Snap Second Look LLC was a creditor of the Debtor. There is an additional fact issue related to whether the Debtor made payments of more than $600 to a creditor in the 90 days before he filed for

[43] Bradley Dec. ¶ 12, Ex. 5 at pp. 118, 120.
[44] Bradley Dec. ¶ 12, Ex. 5 at p. 120; Bradley Dec. ¶ 13, Ex. 6 at p. 122.
[45] Bradley Dec. ¶ 6, Ex. 1 at 91:11-25.

bankruptcy. Additionally, it is not clear from the Plaintiff's evidence whether the Debtor knowingly omitted to schedule these purported creditors. This all precludes reliance on a failure to disclose payments to the bed set creditor or a failure to schedule the purported creditor in entering summary judgment on this issue.

G. The Plaintiff Failed to Establish That the Debtor Knowingly or Fraudulently Failed to Disclose Income from a Car Repair Business or the Income Shown as Qualified Business Income on His 2019 Tax Return.

The Plaintiff alleges that the Debtor failed to disclose income received from operating a business for which he claimed a qualified business exemption on his 2019 federal tax returns, as well as income from operating a vehicle repair business out of the garage at his residence. The circumstances surrounding these omissions were not clear, and the Court cannot find on summary judgment that the Debtor knowingly or fraudulently omitted this income, precluding reliance on these allegations in entering summary judgment on the Plaintiff's § 727(a)(4)(A) claim.

H. The Plaintiff Failed to Establish That the Debtor Knowingly or Fraudulently Failed to Properly Report His Rent on Schedule J.

The Plaintiff also asserts that the Debtor made a false oath on Schedule J when he stated he paid rent in the amount of $400.00. The Plaintiff asserts that the Debtor's girlfriend pays half of his rent, so he should have reported his rent as $200 on Schedule J. There remains a fact issue as to whether the Debtor paid the full $400 in rent when the case was filed. It was not at all clear from the Debtor's testimony at the Rule 2004 examination that he paid the full $400 when the case was filed:

> Q. Okay. You also listed that you had $400, that your monthly expense is $400 in rent, but since you share that expense with your girlfriend, in fact, you actually only have $200 in monthly expenses for rent; correct?
> A. Correct.

Q. Okay. Is there --
MR. RILEY: What date, what date are we talking about, as of April or now?
MS. BRADLEY: As of April 2020.
MR. RILEY: Okay. So as of April 2020, did you guys split the bill, Roberto, or did you pay the rent?
THE WITNESS: I used to pay the rent so she could save money.
Q. So when did you start?
A. I don't remember. I don't remember.
Q. So you could have been splitting the rent because, I mean before, at the beginning you testified that you split the rent since --
A. Yes.
THE COURT REPORTER: You cut out.
A. Yes, yes, I said that, yeah, we split the rent, yeah.[46]

This all precludes reliance on a failure to properly report rent in entering summary judgment in favor of the Plaintiff.

**Conclusion**

The Plaintiff has come forward with facts establishing that the Court should deny the Debtor's discharge based on his failure to maintain records from which his financial condition might be ascertained. The Plaintiff has also come forward with facts establishing that the Court should deny the Debtor's discharge based on the knowing and fraudulent false oaths or accounts made by the Debtor in this case. A party opposing summary judgment must show the Court what evidence it has that would convince the Court to accept its version of the events at trial as the trier of fact. At this "put up or shut up moment" in the adversary proceeding, the Debtor has not shown the Court any evidence in opposition to either claim, and thus the Court finds that there is no genuine dispute as to any material fact and the Plaintiff is entitled to judgment as a matter of law. Accordingly,

[46] Bradley Dec. ¶ 6, Ex. 1 at 98.

IT IS THEREFORE ORDERED: the Plaintiff's Motion for Summary Judgment is granted.

IT IS FURTHER ORDERED: Roberto R. Ledesma's Chapter 7 discharge is denied pursuant to 11 U.S.C. § 727(a)(3) and § 727(a)(4)(A).

#####